UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 2:20-CR-65 |
| | ) | |
| vs. | ) | |
| | ) | |
| EMORY Q. JACKSON, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**REPORT AND RECOMMENDATION**

Defendant, Emory Q. Jackson, filed a Motion to Suppress evidence obtained during a stop and search. [Doc. 21]. Specifically, Defendant seeks to suppress a handgun recovered during the search of a vehicle in which he was a passenger and statements made by Defendant. The United States responded in opposition [Doc. 27]. This matter is before the Court pursuant to 28 U.S.C. § 636(b) and the standing orders of the District Court for a Report and Recommendation.

On October 13, 2020, the Court conducted an evidentiary hearing on Defendant's motion. Present at the hearing were Defendant and his counsel, J. Russell Pryor, Esq., and Assistant United States Attorney Kateri Dahl, Esq. Testifying at the hearing was Officer Jeff Legault, who supervises the narcotics unit of the Johnson City Police Department. The matter is now ripe for resolution. For reasons stated herein, the undersigned **RECOMMENDS** the Motion to Suppress [Doc. 21] be **GRANTED in part and DENIED in part**.

**I. PROCEDERAL BACKGROUND**

On September 1, 2020, the Grand Jury returned a single-count indictment charging Defendant with possessing a firearm in violation of 18 U.S.C. 922(g)(1), i.e. being a felon in possession of a weapon. [Doc. 14]. Defendant's Motion to Suppress alleges that law enforcement officers violated his Fourth Amendment rights by stopping the vehicle in which he was a

passenger, seizing personal property from the vehicle without first obtaining a warrant, and by questioning him without advising him of his *Miranda* rights. [Doc. 21, p. 1]. Defendant contends that the Court should exclude personal property recovered from his backpack and the vehicle in which he was riding, as well as the statements he made both during the stop and later at police headquarters. He asserts that suppression is required because the stop was conducted without a warrant, did not fall into a recognized exception to the warrant requirement, occurred without probable cause or reasonable suspicion, and lasted for an unconstitutionally long duration. [Doc. 21, p. 2]. Defendant further asserts that even if the stop was constitutional, his statements should be suppressed because he was not properly Mirandized.

In response, the United States contends that Officer Legault stopped the vehicle at issue based on his knowledge that Defendant had an outstanding warrant for shoplifting and criminal trespass. [Doc. 27, p. 1]. Officer Legault had likewise sworn that this was the basis for the stop in the Criminal Complaint filed in this matter. [Doc. 3, p. 2]. The United States further submits that because Officer Legault knew about the existence of Defendant's outstanding warrant and recognized Defendant in the vehicle, he had probable cause to stop the vehicle and arrest Defendant. [Doc. 27, p. 3]. Additionally, the government contends that Defendant lacks standing to challenge the search of the vehicle because he neither owned nor had a possessory interest in it at the time of the stop. [Doc. 27, pp. 4-5]. As to Defendant's request to suppress the statements he made, the government takes the position that *Miranda* warnings are not required for routine traffic stops and notes that the law permits "a moderate number of questions to determine [a detainee's] identity and to confirm or dispel an officer's suspicions." [Doc. 27, p. 6].

## II. FINDINGS OF FACT

On August 7, 2020, the Johnson City Police Department arrested Defendant after stopping the vehicle in which he was a passenger. Before the stop, Officer Jeff Legault received a series of

text messages from a paid confidential informant, Melissa Gunter, notifying the officer that Defendant Jackson had a weapon and ultimately that he was travelling in Ms. Gunter's truck with that weapon. She also advised Officer Legault that she had purchased tires from Defendant, and he was riding with her to have the tires installed at the Tire Barn. At the time Ms. Gunter notified Officer Legault that Defendant had possession of a gun, the officer already knew Defendant from prior encounters[1] and was aware that Defendant had a felony conviction which prohibited him from lawfully possessing a firearm. Ms. Gunter was also known to Officer Legault as he had interacted with her previously on about ten occasions. Officer Legault was also aware that Ms. Gunter had "an ax to grind" with Defendant because she believed Defendant had been involved in killing one of her dogs.

Upon receiving Ms. Gunter's report, Officer Legault checked with dispatch and confirmed that Defendant was wanted on an outstanding warrant. Officer Legault then went to look for Ms. Gunter's vehicle. He had no trouble locating the vehicle as he had told Ms. Gunter what route to take to the Tire Barn, and her Ford truck was readily identifiable because it was accessorized with orange flames painted on the tailgate and the tires she was having installed were piled up in the truck's bed. Officer Legault was parked at an old restaurant and as Ms. Gunter's vehicle passed, he was able to verify that Defendant was riding in the front passenger seat of the vehicle. Officer Legault followed the vehicle for a moment and then initiated a stop. Once Ms. Gunter's vehicle was stopped, Officer Legault turned on his body camera which ran for the duration of the stop. Initially, the officer spoke with Ms. Gunter, reviewed the vehicle's registration, and ran a search on Ms. Gunter. Ms. Gunter exited the truck and quietly (so that Defendant could not hear her) advised the officer that Defendant had placed the gun in the console. Officer Legault then asked

---

[1] The video of the stop entered as Exhibit 2 to the hearing also demonstrated that Officer Legault knew Defendant, as he used his nickname "Q" to address him during the stop, and Defendant responded in a manner which also suggested his familiarity with the officer.

Ms. Gunter if she had anything illegal in the truck and requested permission to search the vehicle, which she granted.

Before conducting the search, Officer Legault then asked Defendant if he had anything illegal in his possession, and in response Defendant disclosed that he had a pipe. Defendant was asked to step out of the vehicle, and Officer Legault patted him down for weapons. Officer Legault then conducted a consensual search of Defendant's backpack. While searching Defendant's backpack, Officer Legault asked Defendant if he had any warrants outstanding. Defendant acknowledged that he did but stated that he had not been taken into custody due to coronavirus.

By this time, another officer, Investigator Barron, had arrived on the scene and stood with Defendant while Officer Legault searched the truck. Officer Legault found a gun in the console of the truck, where Ms. Gunter had advised it was located. The officer then asked Ms. Gunter if she was a felon and if the gun belonged to her, and she responded in the negative to both questions. Officer Legault then walked around the truck and asked Defendant what he knew about the gun. Defendant responded that he had been talking to Investigator Barron and explaining that it wasn't his gun. Defendant admitted that he knew about the gun but stated that it did not belong to him. He made several other remarks related to why he was with Ms. Gunter in her truck and speculated that perhaps Ms. Gunter had the gun with her because he was a "big dude" and she might be "leery of him." Defendant also contended that if it had been his gun he would have tried to run and dispose of the weapon. At that point, Officer Legault told him he would have to go to the station and talk about the gun and placed Defendant in handcuffs. Defendant was then escorted to the back of a police cruiser by a third responding officer and was transported to headquarters. Defendant left the scene approximately eleven and a half minutes after Officer Legault made the initial stop of Ms. Gunter's vehicle.

With Defendant in custody, Officer Legault returned to take a written statement from Ms. Gunter. During their conversation, Ms. Gunter talked about how Defendant had previously killed one of her dogs, but she had continued to remain in communication with Defendant. Once Ms. Gunter had provided her statement, she was permitted to leave the scene.

Officer Legault then returned to police headquarters and personally provided Defendant with *Miranda* warnings and processed him on his outstanding warrant; however, Officer Legault admits that Defendant was never provided with *Miranda* warnings at the scene of the stop. The proof also demonstrated that Officer Legault never advised Defendant he was under arrest for the outstanding warrant the officer used as the basis for stopping Ms. Gunter's truck. In fact, it was three days after the stop when Defendant was ultimately served with the warrant.

During the hearing on this matter the government asked Officer Legault if Defendant was in custody when he was questioned about the gun at issue. Officer Legault stated that "[a]ctually he was not yet, but he was under arrest for the warrants."

## III. LEGAL ANALYSIS

Defendant alleges the stop, search, and questioning did not comport with constitutional requirements and for that reason contends that the Court should suppress evidence and statements obtained by the Government as a result of the stop. For clarity, the Court will address each part of Defendant's stop in turn.

### a. The stop of Ms. Gunter's vehicle did not violate Defendant's Fourth Amendment rights.

The first issue that must be addressed is whether the stop of the vehicle in which Defendant was a passenger complies with the Fourth Amendment. The Fourth Amendment provides people with "the right to . . . be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. The Supreme Court has explained that "[w]hen a police officer makes a traffic stop the driver of the car is seized within the meaning of the Fourth

Amendment…[and]…a passenger is seized as well and so may challenge the constitutionality of the stop." *Brendlin v. California*, 551 U.S. 249, 251 (2007); *see also United States v. Jones*, 562 F.3d 768, 772-73 (6th Cir. 2009). This means that, as a preliminary matter, Defendant has standing to challenge the constitutionality of the police stop.

The Supreme Court has stated that "an automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Whren v. United States*, 517 U.S. 806, 810 (1996). A stop is not "unreasonable" where officers possess a valid warrant for persons known to officers to be travelling in a vehicle before they stop that vehicle. *United States v. White*, 162 Fed. App'x. 520, 523 (6th Cir. 2006) (applying *United States v. Hudson*, 405 F.3d 425, 432 (6th Cir. 2005) (setting forth a standard for police stops of vehicles believed to be carrying persons wanted on warrants)). In order for officers to possess constitutionally valid grounds to make these stops, the Sixth Circuit requires that they have "reasonable suspicion, based on all the facts presented to them, to believe that [the person wanted on a warrant] was an occupant of the vehicle" being stopped. *Id.* To satisfy the requirement of reasonable suspicion, the officer stopping a vehicle "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). *Terry* analysis asks, "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 19-20. As in other cases involving vehicle stops, the Court looks at the totality of the circumstances when asking whether reasonable suspicion was established. *Hudson*, 405 F.3d at 432 (citing *Northrop v. Trippett*, 265 F.3d 372, 381 (6th Cir. 2001)).

Here, applying *Hudson*, the Court asks whether it was reasonable for Officer Legault to stop Ms. Gunter's truck based on specific, articulable facts that established reasonable suspicion that Defendant was inside the truck. Officer Legault knew about Defendant's outstanding warrant

and had confirmed that it was still active. On the day of the stop, Ms. Gunter had advised Officer Legault via multiple text messages that Defendant would be a passenger in her truck, and he instructed her on the route to take to her destination. It was easy for Officer Legault to spot Ms. Gunter's truck because it was very distinctive, and the bed of the truck was filled with tires. Furthermore, Officer Legault visually confirmed Defendant's presence in the truck prior to making the stop. Only after he observed Defendant in Ms. Gunter's truck did Officer Legault initiate a stop. In other words, by the time he made the stop, Officer Legault had more than reasonable suspicion that Defendant was a passenger in Ms. Gunter's vehicle; he had confirmed knowledge. For these reasons, Officer Legault's stop of Ms. Gunter's truck was constitutionally permissible such that the stop itself does not provide justification for the requested suppression.

In reaching this conclusion, the Court has considered Defendant's contention that the warrant should not have served as a basis for the stop because the Johnson City Police Department had a general order in place on that date directing that Defendants should not be brought into custody based upon misdemeanor charges. The Court notes that Officer Legault did not agree that such a policy existed, and none was introduced into evidence at the hearing in this cause; thus, there is no factual basis for this contention that would compel a legal analysis of the assertion.

Defendant also argues that because he was not served with the arrest warrant Officer Legault claims to have used to initiate the stop until three days after his arrest and was never told about the warrant by the officer, that warrant cannot serve as the basis for the stop. Given that "subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis" this argument is unavailing. *Whren v. United States*, 517 U.S. 806, 813 (1996). Without question, Defendant had an outstanding arrest warrant at the time Officer Legault stopped the vehicle in which he was a passenger. Officer Legault verified both the validity of the warrant and Defendant's

presence in the vehicle before stopping it. Even if Officer Legault had another more primary motivation for making the stop, it does not invalidate the validity of the stop. *Id.* at 811.

Defendant also takes issue with the duration of the traffic stop, contending that it was improperly prolonged; however, as set forth above, the Defendant was transported to police headquarters only eleven and one-half minutes after the vehicle was stopped. Officer Legault followed the customary process of a traffic stop in running Ms. Gunter's license and registration. The officer then obtained consent to search her vehicle. When a vehicle has been stopped based on constitutionally sound grounds, the stop may be extended to conduct a warrantless search of the vehicle if the owner of the vehicle provides consent for the search, regardless of whether there is probable cause to do so. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1972).

### b. The searches of Ms. Gunter's vehicle and Defendant's backpack are also permitted by the Fourth Amendment.

A further issue is whether the search of the vehicle after the stop was made complies with the Fourth Amendment. The Supreme Court has explained that "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978) (internal citations omitted). As such, in the instant action the Court must ask whether Defendant, in his role as a passenger with no legal or possessory interest in the vehicle, has the requisite personal rights to challenge the search where Ms. Gunter unequivocally gave her consent for the search to be conducted.[2] Applicable precedent compels a finding that he does not. The Sixth Circuit has "routinely held that passengers who have no expectation of privacy or possessory interest in a stopped vehicle do not have standing to challenge the validity of a subsequent search of that vehicle on Fourth Amendment grounds." *United States*

---

[2] Defendant argued that because Ms. Gunter was working with the police as a confidential informant at the time of the stop, she could not provide consent for her vehicle to be searched; however, Defendant cited no legal support for that proposition.

*v. Bah*, 794 F.3d 617, 626 (6th Cir. 2015). A line of cases cited by the *Bah* Court illustrate this principle. *Id* (citing *United States v. Decker*, 19 F.3d 287, 288-89 (6th Cir. 1994) (a conspirator had no expectation of privacy in a vehicle belonging to another member of the conspiracy); *United States v. Ellis*, 497 F.3d 606, 612 (6th Cir. 2007) (explaining that while a passenger may challenge a stop and a subsequent detention, they may not challenge the search of a vehicle in which they lack an expectation of privacy).

Here, the Court must determine whether Defendant had an expectation of privacy in Ms. Gunter's truck. Past Sixth Circuit cases, *Bah*, *Ellis*, and *Decker*, have uniformly concluded that a passenger of a vehicle—who lacks any possessory interest in that vehicle—does not have standing to seek suppression of evidence recovered during a search of the vehicle. Defendant did not own the truck at issue nor was any evidence presenting suggesting that he had ever asserted a possessory interest in it. In fact, Ms. Gunter had bought tires from Defendant and he was accompanying her to have the tires installed when the stop was made. Without a legal or possessory interest in the truck, Defendant lacks standing to seek suppression of evidence recovered during the search of the truck. Accordingly, the search of the truck comports with the Fourth Amendment and does not require suppression of the evidence obtained.

The search of Defendant's backpack also comports with the Fourth Amendment because Defendant provided consent to search it. Where a person gives consent to a search of their property, that person's Fourth Amendment right is considered waived; the Court looks at "words, gestures, or conduct" in analyzing whether a person has voluntarily consented to a search. *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004) (internal citations omitted).

Officer Legault asked Defendant if he could search his backpack and then audibly repeated to Defendant the consent that Defendant had provided, as can be observed in Officer Legault's body cam video footage which was entered into evidence during the hearing. Defendant did not

deny the confirmation of consent in the video and stood nearby while Officer Legault searched the backpack. In fact, Defendant continued to interact with Officer Legault during the search. Accordingly, the Court finds that the search of Defendant's backpack was undertaken with his consent, obviating any Fourth Amendment claim.

### c. The questioning of Defendant at the scene did not comport with the Fifth Amendment and *Miranda*.

A further issue is whether the questioning of Defendant by officers at the time of the stop complies with the Fifth Amendment and *Miranda* protections. The Fifth Amendment guarantees that, "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Interpreting this provision, *Miranda v. Arizona* sets forth the specific notices that law enforcement officers **must provide** to guard a defendant's Fifth Amendment rights. 384 U.S. 436, 444 (1966). The Supreme Court has made it clear that the Government "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id. Miranda* warnings require "a suspect be advised by investigators of, among other things, his right to remain silent and his right to counsel. *United States v. Clayton*, 937 F.3d 630, 632 (6th Cir. 2019). To determine whether *Miranda* safeguards apply, the court must determine whether a custodial interrogation took place. *Hart v. Steward*, 623 Fed. App'x. 739, 745 (6th Cir. 2015) (citing *Miranda*, 384 U.S. at 444). As a general proposition, routine traffic stops do not rise to the level of custodial interrogation and do not implicate *Miranda*; yet, "if a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he is entitled to the full panoply of protections prescribed by *Miranda*." *Berkemer v. McCarty,* 468 U.S. 420, 421 (1984).

The first factor the Court considers in making this determination is whether a reasonable person in Defendant's position would have felt free to leave. *United States v. Swanson,* 341 F.3d

524, 529 (6th Cir.2003); *United States v. Mahar*, 801 F.2d 1477, 1499 (6th.Cir. 1986) (finding *Miranda* warnings required where defendant was detained by armed agents and did not feel free to leave during questioning). Additional factors used to determine whether there was a custodial interrogation are:

> (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other *indicia* of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police … [or] acquiesced to their request to answer some questions.

*Id.* Expounding on the interrogation element of custodial interrogation, the Supreme Court has stated that

> the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response.

*Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980); *see also United States v. Hurst*, 228 F.3d 751, 759 (6th Cir. 2000). For example, in *United States v. Asberry*, No. 5:06 CR 330, 2007 U.S. Dist. LEXIS 17958 * at *15-16 (N.D. Ohio Mar. 12, 2007), the Court found that questioning whether a suspect has a valid gun permit, when made by law enforcement and directed to a suspect during a traffic stop, is considered an interrogation and must only be undertaken after issuance of *Miranda* warnings..

Here, the Court must determine whether the questioning of Defendant by the officers who participated in the traffic stop constituted custodial interrogation. Officer Legault's testimony indicated that the purpose of the vehicle stop was to effectuate the arrest of Defendant on his outstanding warrant. Moreover, while Officer Legault claimed that Defendant was not in custody when questioned about the gun found in Ms. Gunter's truck, he specifically testified that Defendant

was already under arrest for "the warrants" at the time he was questioned, which would necessarily mean that Defendant was also in custody.

Even if Defendant was not under arrest, if the totality of the circumstances demonstrate that he was otherwise deprived of his freedom to the degree associated with formal arrest, an officer's questions can constitute custodial interrogation. *United States v. Beheler*, 463 U.S. 1121, 1125 (1983). At the time Defendant was questioned about the gun found by Officer Legault, he had already been patted down, admitted to possessing drug paraphernalia and denied possession of any other illegal items. Defendant had been made to exit the vehicle and was asked whether he had any outstanding warrants, to which he responded in the affirmative. Additionally, another officer remained at Defendant's side while Officer Legault searched the vehicle[3]. At this point, a reasonable person in the same circumstances as Defendant would likely not have felt free to leave. There can also be little doubt but that Officer Legault's purpose for questioning Defendant about the gun he had found was to obtain evidence to charge him with being a felon in possession, given that a primary purpose for his stop of Ms. Gunter's truck was that she had advised the officer that Defendant, a felon, was riding with her and possessed a firearm. While the questioning was not hostile, it was coercive under the circumstances. The length of questioning was not extensive; however, Defendant was not advised that the questioning was voluntary nor that he was free to leave. Given that another officer was posted beside Defendant during the search, the circumstances would not indicate to Defendant that he was free to leave; however, Defendant was not handcuffed when questioned. Additionally, the record demonstrates that it was Officer Legault and not Defendant who had initiated contact.

---

[3] Given that Officer Legault had already searched Defendant's person, Defendant was outside the vehicle and another officer was posted next to him, the public-safety exception would not apply as there would be no reason to believe that Defendant might have had access to a weapon that someone other than the police would be able to access. *United States v. Williams,* 483 F.3d 425 (6th Cir. 2007).

Officer Legault knew or should have known that a question about the firearm found in the truck—after Defendant had already been checked for weapons—could elicit an incriminating response. *Miranda*, 446 U.S. at 300-01. Unlike a mere procedural question concerning whether Defendant possessed a weapon, asked in order to secure the scene, these officers' questions about whether Defendant owned a gun they had already located and secured are the type designed and known to elicit incriminating responses. *See Asberry*, 2007 U.S. Dist. LEXIS 17958* at *15-16. Even if Defendant was not formally under arrest as testified to by Officer Legault, the officer's questions about the gun found would have constituted interrogation necessitating *Miranda* warnings because the totality of the circumstances demonstrate Defendant's freedom was restricted to the degree associated with an arrest. *Swanson,* 341 F.3d at 529. As such, Defendant was subjected to custodian interrogation at the scene of the stop. Accordingly, Defendant's responses to officers' questions at the scene about the ownership of the gun found in the truck should be excluded because the questions in this context violated Defendant's Fifth Amendment rights.

> **d. Under *Missouri v. Seibert*, statements Defendant made at police headquarters after receiving his *Miranda* warnings should also be suppressed.**

The final issue is whether Defendant's statements made at police headquarters following his arrest should also be suppressed. Here, Defendant's questioning is split into un-Mirandized and Mirandized questioning. In these instances, the Sixth Circuit applies a multi-factor test to determine whether the midstream warning was effective. *United States v. Ray*, 803 F.3d 244, 272 (6th Cir. 2015). Those factors, first applied in *Missouri v. Seibert*, are as follows:

> (1) the completeness and detail involved in the first round of questioning; (2) the overlapping content of the statements made before and after the warning; (3) the timing and setting of the interrogation; (4) the continuity of police personnel during the interrogations; and (5) the degree to which the interrogator's questions treated the second round as continuous with the first.

*United States v. Pacheco-Lopez*, 531 F.3d 420, 427 (6th Cir. 2008) (citing *Seibert*, 542 U.S. 600, 615 (2004)). The analysis of each element undertaken by the Court in *Ray* is particularly instructive when considering the instant case. There, the Sixth Circuit noted that by asking an un-Mirandized defendant "about his possession and ownership of the guns" at the place a felon-defendant was staying, "the officers 'asked pre-*Miranda* the [only] question[s] relevant to a felon-in-possession charge.'" *Id.* at 372 (quoting *United States v. Ashmore*, 690 Fed. App'x. 306, 317 (6th Cir. 2015)). Additionally, the *Ray* Court determined that the "continuity of police personnel between [the defendant's] initial and follow-up interrogations" weighed in favor of suppression. *Id.* at 375-76. After applying the *Seibert* analysis, the *Ray* Court ultimately determined that even the defendant's post-Miranda statements had to be suppressed. 690 Fed. App'x. at 367. In doing so, the *Ray* Court further observed that a defendant cannot waive Miranda rights "if the underlying warning was ineffective." *Id.* at 377 (citing *Seibert,* 542 U.S. at 612 n. 4).

Here, Defendant was questioned at the scene of the initial stop without first being given *Miranda* warnings. Defendant was asked whether he owned or had knowledge of the gun recovered from the console of the stopped vehicle. In responding to these questions, Defendant provided a detailed statement about his knowledge of the gun being in the truck and his theory on why the gun was in the vehicle. Officer Legault testified at the hearing that Defendant was under arrest at the time he was questioned about the gun but was under arrest for "the warrants" and not possession of the gun. Defendant was not provided with the required *Miranda* warnings until he was already at police headquarters and then it was Officer Legault who provided those warnings. When Defendant was again questioned about his knowledge and possession of the gun in the console of the stopped vehicle after receiving his *Miranda* warnings, his statements were essentially the same as those given at the scene of the stop.

In applying the *Seibert* factors to the instant action, the Court observes parallels to the facts in *Ray*. Just as in *Ray*, pre-*Miranda* statements made by Defendant were detailed and relatively complete and officers' pre-*Miranda* questioning was designed to elicit answers relevant to the central issue regarding the charge ultimately brought against him. Additionally, as in *Ray*, there is continuity of police personnel between the initial and subsequent investigation. Here, the officer who questioned Defendant about the gun at the scene of the stop is the same officer who Mirandized him at police headquarters a short time later and questioned him for a second time[4]. Given that the Government has charged Defendant with being a felon-in-possession under 18 U.S.C. § 922(g)(1), *Ray* instructs that under the circumstances here, the un-Mirandized statements which were sought with the intention of securing such a charge may not be cured by later Mirandized questioning. *Id.* at 377. Under the facts presented here, the Court simply cannot find that a reasonable person in Defendant's shoes would have believed the second round of questioning was "a new and distinct experience" and that he had a "genuine choice" as to whether to follow up on his earlier admissions. *Seibert,* 542 U.S. at 615-16.

## IV.  CONCLUSION

Officer Legault acted within the confines of the law when stopping Ms. Gunter's vehicle and searching its contents; therefore, Defendant is not entitled to suppression of the evidence produced by the search. At the same time, Defendant's statements both at the scene of the stop and thereafter were obtained in a manner which violated Defendant's constitutional right and as such, the government should not be permitted to introduce those statements. For these reasons and those set forth above, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress [Doc. 21] be **GRANTED** as to the statements he made both at the scene of the stop and later at police

---

[4] The Court finds that although the time between the on the scene questioning of Defendant and the questioning of him at police headquarters appears to have been brief, under applicable caselaw, it was sufficient for that particular factor not to weigh in favor of suppression.

headquarters, and **DENIED** as to the evidence yielded from the search of Defendant's backpack and the vehicle in which he was a passenger.[5]

                              Respectfully Submitted,

                              s/Cynthia Richardson Wyrick
                              United States Magistrate Judge

---

[5]Any objections to this report and recommendation must be served and filed within **seven (7) days** after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the time period waives the right to appeal the District Court's order). The District Court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).