UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>　　　　　　Plaintiff,<br>v.<br>EMORY Q. JACKSON,<br>　　　　　　Defendant. | No. 2:20-cr-65<br><br>Judge Greer |

**UNITED STATES'S OBJECTIONS TO THE
REPORT AND RECOMMENDATION (DOC. 34)**

The United States objects to the magistrate judge's recommendation to suppress Emory Jackson's statements to law enforcement officers. (*See* Doc. 34, Report & Recommendation at 10-15.) The magistrate judge erred in concluding that Jackson was "in custody" for *Miranda* purposes when he was questioned during a traffic stop. The Supreme Court has repeatedly held that the kind of detention involved in a traffic stop or *Terry* stop does not constitute *Miranda* custody. The Supreme Court has also repeatedly rejected the kind of reasoning that the magistrate judge employed to reach the contrary conclusion. The portion of the magistrate judge's report recommending that Jackson's statements be suppressed should be overruled and Jackson's motion to suppress (Doc. 21) should be denied in its entirety.

FACTUAL AND PROCEDURAL HISTORY

**I.　Officers stop a vehicle in which Jackson is traveling, find a gun inside the center console, and, after briefly questioning Jackson, arrest him.**

On the morning of August 7, 2020, Johnson City Police Officer Jeff Legault received a series of text messages from Melissa Gunter, a confidential informant, stating that she had seen Jackson carrying a firearm. (R. 39, Transcript at 6.) Gunter explained that she had just purchased some tires from Jackson and he was riding with her to have the tires installed at the

Tire Barn on Bristol Highway. (*Id*. at 6-7.) Gunter stated that Jackson had the gun with him inside Gunter's truck. (*Id*. at 7.)

Officer Legault was familiar with Jackson from previous encounters and knew that Jackson was a convicted felon. (*Id*. at 6.) The officer also knew that Jackson had outstanding warrants in Washington County for shoplifting and trespassing. (*Id*. at 7-8.) After confirming with dispatch that those warrants were still valid, Officer Legault went to look for Gunter's truck in the hope that he would be able to find Jackson. (*Id*.)

The officer had no problem finding the truck because Gunter had texted the officer information about her location and the route she was taking to the Tire Barn. (*Id*. at 7.) Gunter's truck was also "very distinguishable" because it had a big orange flame painted on the tailgate and several tires in the bed. (*Id*. at 8.)

When Officer Legault saw the truck, he observed Jackson sitting in the passenger seat. (*Id*. at 7.) After following the truck for a short distance, the officer initiated a traffic stop, and Gunter pulled into a business parking lot off of Princeton Road. (*Id*. at 9; *see also* Exhibit 2 at 0:00 – 1:15.[1])

Officer Legault approached Gunter on the driver's side and informed her that the tag on her truck did not match her vehicle. (Exhibit 2 at 1:27 – 1:30.) He then asked for her license and registration. (*Id*. at 1:30 – 1:35.) While Gunter was attempting to get those items, Officer Legault confirmed that Jackson was the passenger in the truck (Doc. 39, Transcript at 9) and engaged in light banter with Jackson, referring to him by his nickname "Q" (*see* Exhibit 2 at 2:07

---

[1] Exhibit 2 from the suppression hearing is a video recording of the traffic stop which was made by Officer Legault's body camera. (Doc. 39, Transcript at 21-27.) Although the magistrate judge had difficulty hearing the audio on that recording during the suppression hearing, she repeatedly assured the parties that she would review the video again before issuing her report and recommendation. (*Id*. at 24-26.)

2

– 2:14 (asking Jackson in jest "What about you Q, do you bite?" after Gunter informed the officer that her dog didn't bite). During that time, Officer Mike Barron arrived on the scene to assist and positioned himself on the passenger side of the vehicle. (*Id*. at 1:37 – 1:40.)

Gunter did not have her license with her and asked if she could get out of the truck to speak with Officer Legault. (*Id*. at 1:53 – 1:56.) The officer indicated that would not be a problem (*id*. at 1:57) and, as Gunter moved away from the truck, she informed Officer Legault under her breath that Jackson had put the firearm "in the middle console." (*Id*. at 3:09 – 3:11.)

After inquiring about where Gunter was going, whether she had outstanding warrants, and whether there were any illegal items in her truck, Officer Legault asked Gunter if she "had a problem with [the officer] searching her car." (*Id*. at 4:13 – 4:14.) Gunter replied, "No, sir." (*Id*. at 4:15.) Officer Legault confirmed that Gunter was consenting to the search given that both she and Jackson had prior criminal history involving drugs. (*Id*. at 4:16 – 4:28.) Gunter assured the officer that she did not have a problem with him searching her truck and reasserted that she did not have anything illegal inside the truck. (*Id*. at 4:28 – 4:30.)

Officer Legault then walked back toward the truck and asked Jackson, who was still sitting in the passenger's seat, whether he had anything illegal on him. (*Id*. at 4:38 – 4:40.) Jackson stated that he had a marijuana pipe (*id*. at 4:40 – 4:43), and Officer Legault informed Jackson that the officer was not "worried about a pipe." (*Id*. at 4:44 – 4:45.) Officer Legault then asked Jackson to get out of the truck so that he could search it. (*Id*. at 4:46 – 4:47.)

As Jackson was getting out of the vehicle, Officer Legault asked for permission to frisk Jackson for weapons. (*Id*. at 5:01 – 5:05.) Jackson consented to the frisk, and Officer Legault did not find any weapons on him. (*Id*. at 5:06 – 5:15.) Officer Legault informed Jackson that

3

Gunter had given the officer permission to search the truck and asked Jackson to step to the side while the officer conducted that search. (*Id*. at 5:15 – 5:21.)

While Jackson was moving away from the truck, Officer Legault asked him if he was "wanted on anything right now." (*Id*. at 5:21 – 5:23.) Jackson responded, "It gotta wait on that coronavirus shit, man." (*Id*. at 5:24 – 5:27.) Officer Legault took that to mean that Jackson was aware that there might be warrants out for his arrest, but that he did not think those warrants would be executed because jails were not accepting some arrests due to the COVID-19 pandemic. (Doc. 39, Transcript at 32; *accord id*. 17-18.) Officer Legault did not inform Jackson that there were valid outstanding warrants for his arrest. (*Id*. at 18.) Nor did the officer serve the warrants on Jackson. (*Id*.)

Instead, Officer Legault proceeded to search the truck and found a firearm in the middle console. (*Id*. at 9-10; *accord* Exhibit 2 at 5:30 – 8:27.) While Officer Legault was in the truck, Jackson was standing to the side talking with Officer Barron. (Doc. 39, Transcript at 9; *accord* Exhibit 2 at 5:30 – 8:27.) Jackson was not handcuffed and had not been told that he was under arrest. (Doc. 39, Transcript at 11; *accord* Exhibit 2 at 8:40 – 10:20.)

After finding the gun in the middle console, Officer Legault turned to Gunter and asked her if she was a felon. (Exhibit 2 at 8:27 – 8:28.) She stated she was not. (*Id*. at 8:29 – 8:30.) Officer Legault noted that there was a gun in the car and asked Gunter if it was hers. (*Id*. at 8:34 – 8:36.) Gunter stated that it was not. (*Id*. at 8:37.)

Officer Legault then walked toward Jackson and asked, "What do you know about that gun in the middle console?" (*Id*. at 8:40 – 8:42.) Jackson responded that he had already told Officer Barron that he knew that there was a gun in the middle console. (*Id*. at 8:43 – 8:46; *accord* Doc. 39, Transcript at 11.) Jackson emphasized that he had started to tell Officer Barron

4

about the gun "before" Officer Legault had "even asked." (Exhibit 2 at 8:47 – 8:48.) Jackson then showed Officer Legault a text message that he had been typing to Officer Barron and which conveyed that same information. (*Id*. at 8:49 – 9:00; *accord* Doc. 39, Transcript at 11.)

Officer Legault asked Jackson how he knew the gun was in the middle console. (Exhibit 2 at 9:00 – 9:01.) Jackson stated Gunter had the gun in the car. (*Id*. at 9:02 – 9:05.) He explained that he had just sold some tires to Gunter and was riding with her to get the money. (*Id*. at 9:06 – 9:36.) Jackson denied owning the gun, explaining that, if it had been his, he would have fled once the officers stopped the car. (*Id*. at 9:40 – 9:50; *accord id*. at 10:12 – 10:20.) Jackson also opined that Gunter had the gun because she was scared of Jackson, who was a "big guy." (*Id*. at 10:01 – 10:07.)

At that point, Officer Legault informed Jackson that the officers were going to be taking both him and Gunter back to headquarters. (*Id*. at 10:24 – 10:27.) Officer Legault ceased his questioning of Jackson and placed handcuffs on him. (*Id*. at 10:28 – 10:40.) Other officers then transported Jackson back to police headquarters. (*Id*. at 10:41 – 11:30)

At headquarters, Jackson was informed of his *Miranda* rights and agreed to waive them and speak with the officers. (Doc. 39, Transcript at 12.) During that interview, Jackson continued to deny owning the gun, but did admit that he knew the gun was in the center console of the car. (*Id*.)

## II. Jackson is charged with possessing a firearm as a felon and moves to suppress the gun and all of his statements to the police.

Jackson was subsequently charged with possessing a firearm as a felon, in violation of 18 U.S.C. § 922(g)(1). (Doc. 14, Indictment.) Jackson moved to suppress the firearm seized from Gunter's car as well as his statements to police. (Doc. 21, Motion to Suppress.) Jackson argued that the gun was the fruit of an unreasonable stop and search of Gunter's truck and

5

claimed all of his statements should be suppressed because he had not been given *Miranda* warnings until he was at police headquarters. (Doc. 22, Suppression Memorandum.) The United States opposed Jackson's motion, contending that the stop and search of Gunter's car were lawful and that *Miranda* warnings had not been required during the stop because Jackson was not in custody at that point. (Doc. 27, Suppression Response.)

After conducting an evidentiary hearing, the magistrate judge recommended denying Jackson's motion to suppress the gun but granting the motion to suppress his statements. (Doc. 34, Report & Recommendation.) The magistrate judge found that the stop of Gunter's truck was lawful because the officers had reasonable suspicion that a person for whom there was an outstanding arrest warrant—*i.e.*, Jackson—was inside the vehicle at the time it was stopped. (*Id*. at 5-8.) The magistrate judge also concluded that the search of Gunter's truck was lawful because Gunter had voluntarily consented to that search. (*Id*. at 8-10.) Accordingly, the magistrate judge recommended that the motion to suppress the firearm be denied. (*Id*. at 15.)

The magistrate judge, however, recommended that Jackson's statements be suppressed. The magistrate judge concluded that Jackson was in custody during the traffic stop and thus should have been given *Miranda* warnings before being asked any questions. (*Id*. at 10-13.) The magistrate judge then found that the failure to give *Miranda* warnings on the scene tainted Jackson's subsequent *Mirandized* statements at police headquarters such that those statements should also be suppressed. (*Id*. at 13-15.)

Pursuant to Federal Rule of Criminal Procedure 59(b)(2), the United States now objects to the magistrate judge's report and recommendation. The United States agrees with the magistrate judge's conclusions regarding the lawfulness of the stop and search of Gunter's truck and thus does not object to the magistrate judge's recommendation to deny Jackson's motion to

6

suppress the firearm. However, the United States maintains that the magistrate judge erred in its *Miranda* analysis. Jackson was not in custody during the traffic stop and thus officers were not required to give him *Miranda* warnings at the scene. The officers properly informed Jackson of his *Miranda* rights and ensured that he had voluntarily waived them before their custodial interrogation of him. Jackson's statements were not obtained in violation of the Fifth Amendment or *Miranda* and they should not be suppressed.

## ARGUMENT

The Fifth Amendment provides that "[n]o person … shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona*, the Supreme Court adopted a set of prophylactic measures to protect that privilege against self-incrimination from the "inherently compelling pressures" of custodial interrogation. 384 U.S. 436, 467 (1966). The Court held that a person questioned by law enforcement officers after being "taken into custody or otherwise deprived of his freedom of action in any significant way" must first "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id*. at 479. "Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (*per curiam*).

An officer's obligation to administer *Miranda* warnings attaches, however, "only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (*per curiam*); *see also Miranda*, 384 U.S. at 477 ("General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding."). In determining whether a person is

7

"in custody" for purposes of *Miranda*, a court must look to "objective circumstances of the interrogation," *Stansbury*, 511 U.S. at 323, and assess "how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action." *Id.* at 325. "Not all restraints on freedom of movement amount to custody for purposes of *Miranda*." *Howes v. Fields*, 565 U.S. 499, 509 (2012). The "relevant environment" must "present[] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.*; *accord Berkemer v. McCarty*, 468 U.S. 420, 437 (1984) ("Fidelity to the doctrine announced in *Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated."). The "ultimate inquiry" is "whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quoting *Mathiason*, 429 U.S. at 495).

The Supreme Court has repeatedly considered whether "the temporary and relatively nonthreatening detention involved in a traffic or *Terry* stop" involves such a degree of restraint and has repeatedly found that it does not. *Maryland v. Shatzer*, 559 U.S. 98, 113 (2010). Indeed, "[t]wo features of an ordinary traffic stop mitigate the danger that a person questioned will be induced 'to speak where he would not otherwise do so freely.'" *Berkemer*, 468 U.S. at 437 (quoting *Miranda*, 384 U.S. at 467). First, detention during a typical traffic or *Terry* stop is "presumptively temporary and brief." *Id.* at 437. After all, "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983). As such, "questioning incident to an ordinary traffic stop is quite different from stationhouse interrogation, which frequently is prolonged, and in which the

8

detainee is often aware that questioning will continue until he provides his interrogators the answers they seek." *Berkemer*, 468 U.S. at 438.

Second, the "circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police." *Id*. The "typical traffic stop is public, at least to some degree" as passersby can witness the interaction between police and the vehicle's occupants. *Id*. That "exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subject to abuse." *Id*. Moreover, the "fact that the detained motorist typically is confronted by only one or at most two policemen further mutes his sense of vulnerability." *Id*.

In short, the atmosphere surrounding an ordinary traffic or *Terry* stop "is substantially less 'police dominated' than that surrounding the kinds of interrogation at issue in *Miranda*." *Berkemer*, 468 U.S. at 438-39. As such, the Supreme Court has consistently concluded that "persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of *Miranda*." *Id*. at 440; *accord Howes*, 565 U.S. at 510 (2012); *Shatzer*, 559 U.S. at 113; *Pennsylvania v. Bruder*, 488 U.S. 9, 11 (1988); *see also United States v. Abdi*, 827 F. App'x 499, 506 (6th Cir. 2020) ("The Supreme Court has held that the temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop does not constitute *Miranda* custody." (internal editing marks and citation omitted)); *United States v. Herrera*, 733 F. App'x 821, 826 (6th Cir. 2018) ("[A] traffic stop does not constitute custody, for the purposes of *Miranda*."). Such stops do not "sufficiently impair [the detainee's] free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights." *Berkemer*, 468 U.S. at 437.

9

In this case, Jackson was not "in custody" until he was arrested by the officers and taken to police headquarters. Officer Legault's testimony about the stop and the video recording of it reveal that this case involved nothing but an ordinary traffic stop. Jackson was detained approximately ten minutes in a public place by two police officers who did not handcuff him or otherwise physically restrain him. *See*, *e.g.*, *United States v. Howard*, 815 F. App'x 69, 79 (6th Cir. 2020) (finding that a traffic stop which was conducted in public view and where defendants were not handcuffed or physically restrained and questioned in a friendly, conversational tone did not involve the kind of arrest-like detention needed for *Miranda* custody). Jackson was permitted to sit inside the truck for nearly half of that time and was only asked to step out of the truck so that the officers could search it pursuant to the owner's consent. The officers asked Jackson for his permission to frisk him before doing so and spoke with him in a cordial, almost friendly, manner up until the time they arrested him. Jackson's freedom of movement was not restrained to "the degree associated with a formal arrest." *Mathiason*, 429 U.S. at 495. Nor was he subject to any of the "inherently compelling pressures" of a station-house interrogation. *Miranda*, 384 U.S. at 467. In short, Jackson was not in custody until Officer Legault placed handcuffs on him and told him that he was being taken to police headquarters.

The magistrate judge reached a contrary conclusion based on two flawed lines of reasoning, both of which have been expressly rejected by the Supreme Court.[2] First, the

---

[2] The magistrate judge also appears to have concluded that Jackson was "in custody" simply because he was being interrogated. (*See* Doc. 34, Report & Recommendation at 13 (relying on fact that Officer Legault's questions were designed to elicit an incriminating response to suggest that Jackson's freedom was restricted to the degree associated with a formal arrest).) However, custody and interrogation are separate elements of the *Miranda* analysis. *See*, *e.g.*, *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980) ("It is clear therefore that the special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation."). A defendant can be in custody without being interrogated and *vice versa*.

10

magistrate judge reasoned that Jackson was under arrest during the stop because Officer Legault's "purpose" in stopping the truck "was to effectuate the arrest of [Jackson] on the outstanding warrant" (Doc. 34, Report & Recommendation at 11) and because, in the officer's mind, Jackson "was already under arrest for 'the warrants' at the time he was questioned" (*id*. at 12). But the Supreme Court has held that a "policeman's unarticulated plan has no bearing on the question of whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer*, 468 U.S. at 442. After all, "[c]oercion is determined from the perspective of the suspect." *Illinois v. Perkins*, 496 U.S. 292, 296 (1990). And an officer's knowledge or beliefs cannot affect the suspect's perspective unless "they are conveyed, by word or deed" to him. *Stansbury*, 511 U.S. at 325. Moreover, "even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest." *Id*. "The weight and pertinence of any communications regarding the officer's degree of suspicion will depend upon the facts and circumstances of the particular case." *Id*. "[B]ut it is the objective surroundings, and not any undisclosed views, that control the *Miranda* custody inquiry."

Here, it is undisputed that, during the stop, Officer Legault never told Jackson about the outstanding warrant or about his plan to arrest Jackson on that warrant. (*E.g.*, Doc. 39, Transcript at 13.) And none of Officer Legault's actions during the stop conveyed an intent to arrest Jackson. On the contrary, when Jackson informed Officer Legault that he had a marijuana pipe on him, the officer expressly informed Jackson that he was not "worried about a pipe." (Exhibit 2 at 4:44 – 4:45.) And when Jackson conveyed his own belief that he was not likely to be arrested on outstanding warrants due to the COVID-19 pandemic, Officer Legault said

11

nothing to suggest otherwise. That Officer Legault planned to arrest Jackson from the outset of the stop is simply irrelevant because that intention was never expressed in word or deed to Jackson. A reasonable person in Jackson's position would have no reason to believe that his detention was anything other than that associated with a typical *Terry* stop. And that kind of detention "does not constitute *Miranda* custody." *Shatzer*, 559 U.S. at 113.

The magistrate judge alternatively reasoned that Jackson was in custody because "a reasonable person in the same circumstances as [Jackson] would likely not have felt free to leave." (Doc. 34, Report & Recommendation at 12.) But the Supreme Court has repeatedly emphasized "that the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody." *Shatzer*, 559 U.S. at 112. In other words, "[d]etermining whether an individual's freedom of movement was curtailed … is simply the first step in the analysis, not the last." *Howes*, 565 U.S. at 509. The Supreme Court has consistently "declined to accord talismanic power to the freedom-of-movement inquiry and h[as] instead asked the additional question of whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id*. (editing marks and citation omitted).

After all, "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *Mathiason*, 429 U.S. at 495. "But police officers are not required to administer *Miranda* warnings to everyone whom they question." *Id*. "*Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Id*. "It

12

was that sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited." *Id*.

*Terry* stops do not generally involve that kind of coercive environment. *E.g.*, *Berkemer*, 468 U.S. at 440. "The very nature of a *Terry* stop means that a detainee is not free to leave during the investigation, yet is not entitled to *Miranda* rights." *United States v. Swanson*, 341 F.3d 524, 528 (6th Cir. 2003). And "a bare conclusion that [a defendant] was in custody because he had been deprived of his 'freedom of action' in a 'significant way' would be in direct contradiction to the Supreme Court's holding in *Berkemer*." *Id*. at 530.

Yet that is precisely the kind of conclusion that the magistrate judge drew in this case. The magistrate judge recognized that, during the stop, Jackson was not subject to any of the traditional aspects of arrest such as handcuffing, physical restraint, or placement inside of a police cruiser. (Doc. 34, Report & Recommendation at 12.) Instead, the magistrate judge reasoned that Jackson was in custody simply because a person in his position would not have felt free to leave. (*Id*.)

In short, the magistrate judge only completed the first step in the *Miranda* custody analysis; it determined that Jackson—like all stopped persons—was not free to leave the traffic stop. *See*, *e.g.*, *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) ("[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."). However, the facts in this case reveal nothing about the stop that rose to the level of a formal arrest. Jackson was not handcuffed or physically restrained, and the officers did not otherwise communicate to Jackson that he was under arrest. Jackson was not in custody until he

13

was actually arrested by Officer Legault. As such, the officers had no obligations to issue him *Miranda* warnings prior to that time.

## CONCLUSION

The magistrate judge erred in concluding that Jackson was in custody during the traffic stop in this case. The Supreme Court has repeatedly held that the detention involved in a traffic stop or *Terry* stops does not constitute *Miranda* custody. The magistrate judge reached a contrary conclusion by relying on two lines of reasoning that the Supreme Court has expressly rejected. The undisputed facts in the record show that manner in which Jackson was detained during the traffic stop was nothing like a formal arrest. Jackson was not arrested until he was placed in handcuffs by Officer Legault. The police had no obligation to give him *Miranda* warnings prior to that time. The magistrate judge's conclusion to the contrary should be overruled by this Court, and Jackson's motion to suppress should be denied in its entirety.

Respectfully submitted,

J. Douglas Overbey
United States Attorney

By: *s/ Luke A. McLaurin*
Luke A. McLaurin
Assistant United States Attorney
NY Bar No. 4623849
800 Market Street, Suite 211
Knoxville, Tennessee 37902
Luke.McLaurin@usdoj.gov
(865) 545-4167

*s/ Kateri L. Dahl*
Kateri L. Dahl
Special Assistant United States Attorney
DC Bar No. 888241224
220 West Depot Street, Suite 423
Greeneville, Tennessee 37743
Kat.Dahl@usdoj.gov
(423) 639-6759