# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE, SITTING AT GREENEVILLE

| | |
|---|---|
| UNITED STATES, | ) |
| | ) |
| v. | ) Case No. 2:20-CR-65 |
| | ) |
| EMORY Q. JACKSON. | ) |

**DEFENDANT'S RESPONSE TO THE GOVERNMENT'S OBJECTION (DOC. 41) TO THE REPORT AND RECOMMENDATION (DOC. 34)**

Comes now Defendant, EMORY Q. JACKSON (hereinafter referred to as "Defendant"), by and through counsel, and states as follows:

RELEVANT FACTS

The vehicle stop in this case occurred on August 7, 2020, and was prearranged by Officer Jeff LeGault and an informant, Melissa Gunter, who was driving the vehicle in which Defendant was a passenger (Doc. 39, Transcript, pp. 6-8). As a result of her outstanding felony drug charges, Ms. Gunter was a paid informant who had been working with Officer LeGault and his agency for some time prior to the date in question (Doc. 39, Transcript, pp. 14, 19, 28; Hearing Exhibit 2 at 4:13-4:20, 33:47-34:08, 34:35-34:40). This vehicle stop had nothing to do with the manner in which the Ms. Gunter was driving, inasmuch as there was no traffic violation involved (Doc. 39, Transcript, pp. 18-19). This is underscored by the fact that Officer Legault completely disregarded Ms. Gunter's inability to produce a driver license or legible vehicle registration (Hearing Exhibit 2 at 1:30-2:29). The primary purpose of this vehicle stop was to arrest Defendant on outstanding state court warrants (Doc. 3, Criminal Complaint, p. 2, ¶ 3; Doc. 21-1, Washington County General Sessions Court Affidavit of Complaint; Doc. 39, Transcript, pp. 7, 19, 31-32). That Officer LeGault stopped the vehicle to arrest Defendant on outstanding warrants has been the government's argument throughout these proceedings (Doc. 27, United States' Response to Defendant's Motion to Suppress,

p. 3; Doc. 39, Transcript, pp. 44-45). Another clear indicia of the fact that Defendant was being arrested is the fact that his side of the vehicle (passenger side) was flanked by Officer Mike Barron --- with his hand on his holstered firearm --- in a maneuver surely intended to prevent an attempted escape (Hearing Exhibit 2 at 4:35-5:20). Although Officer LeGault did not specifically tell Defendant that he was under arrest at the outset of the interaction, Officer LeGault testified that he did not do so because Defendant already knew he had outstanding warrants (Transcript, pp. 31-32). Despite the purpose of the stop, Defendant was never given *Miranda* warnings at the scene of the stop, although the warnings were given later at the police headquarters (Doc. 39, Transcript, pp. 12-13). Nevertheless, Officer LeGault immediately began asking Defendant questions after stopping the vehicle (Hearing Exhibit 2 at 2:09-2:13), and shortly thereafter began to explicitly question Defendant about the contents of the vehicle (Hearing Exhibit 2 at 4:37-4:57). After finding the firearm, Officer LeGault immediately began questioning Defendant about the firearm (Hearing Exhibit 2 at 8:04-8:41).

ARGUMENT

The Fifth Amendment provides: "No person ... shall be compelled in any criminal case to be a witness against himself...." In *Miranda v. Arizona*, 384 U.S. 436 (1966), the United States Supreme Court addressed how to protect the Fifth Amendment privilege against self-incrimination from the coercive pressures inherent to custodial interrogations. The Court held that:

> the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of [a] defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make

may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* at 444 (footnote omitted).

Post-*Miranda* decisions "make clear that the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned. *Stansbury v. California*, 511 U.S. 318, 323 (1994).

In its objection (Doc. 41) to the Report and Recommendation (Doc. 34), the government urges the court to adopt a fiction: that the vehicle stop in this case was "nothing but an ordinary traffic stop" (Doc. 41, United States's Objections to the Report and Recommendation, p. 10). The government cites numerous cases in support of its objection (Doc. 41), all of which are factually distinguishable from the case at hand, and none of which involve an officer stopping a vehicle to arrest a passenger on outstanding warrants. None of the cases cited by the government support its contentions.

In *Berkemer v. McCarty*, 468 U.S. 420 (1984), the case most often cited by the government in its objection, the interrogation occurred roadside after an officer observed the defendant's car weaving in and out of a lane on the interstate, causing the officer to force the defendant to stop and exit his vehicle. *Id.* at 423. The Supreme Court held that roadside questioning subsequent to "a routine traffic stop does not constitute a 'custodial interrogation' for the purposes of the *Miranda* rule." *Id.* at 421. The *Berkemer* Court also utilized the terms "ordinary traffic stop" and "typical traffic stop" to define the boundaries its ruling. *Id.* at 437, 438. The Court determined that a routine (or ordinary or typical) traffic stop, "by itself," does not render a person "in custody." *Id.* at 441. The applicability of *Berkemer* is limited to routine (or ordinary or typical) traffic stops. The government also cites *Pennsylvania v. Bruder*, 488 U.S. 9 (1988), a case with facts similar to those of *Berkemer*,

and in which the holding is wholly dependent upon *Berkemer*. *Id.* at 10-11. The same applies to the government's citation of *United States v. Abdi*, 827 Fed.Appx. 499, 506-507 (6th Cir. 2020); *United States v. Herrera*, 733 Fed.Appx. 821 (6th Cir. 2018) (although *Herrera* does not cite *Berkemer*, the facts and the reasoning of the holding are essentially the same); *United States v. Howard*, 815 Fed.Appx. 69 (6th Cir. 2020); and *United States v. Swanson*, 341 F.3d 524 (6th Cir. 2003). The vehicle stop in this case was not a routine (or ordinary or typical) traffic stop. Unlike *Berkemer* and the other referenced cases, here was no traffic violation involved (Doc. 39, Transcript, pp. 18-19). The purpose of Officer LeGault's vehicle stop was to arrest Defendant on outstanding state court warrants (Doc. 3, Criminal Complaint, p. 2, ¶ 3; Doc. 21-1, Washington County General Sessions Court Affidavit of Complaint; Doc. 27, United States' Response to Defendant's Motion to Suppress, p. 3; Doc. 39, Transcript, pp. 7, 19, 31-32, 44-45). Also distinguishable is the fact that there was no outstanding arrest warrant in *Berkemer*, *Bruder*, *Abdi*, *Herrera*, *Howard*, or *Swanson*.

In *Oregon v. Mathiason*, 429 U.S. 492 (1977), the defendant voluntarily went to the police station, where he was immediately informed that he was not under arrest, and left the police station without hindrance after being interviewed by the officers. *Id.* at 495. The Supreme Court held that these facts made it "clear" that the Defendant "was not in custody." *Id.* The government also cites *California v. Beheler*, 463 U.S. 1121 (1983), a case with facts and a result quite similar to those of *Mathiason*, simply to again quote *Mathiason* (United States Objections to the Report and Recommendation, Doc. 41, p. 8). Here, Defendant was not voluntarily in the presence of the officers, was never told he was not under arrest, and was not allowed to leave unhindered. The officers carried out their objective --- to arrest Defendant, and it is clear he was in custody from the moment of the vehicle was stopped. Neither *Mathiason* nor *Beheler* involved an outstanding arrest warrant.

In *Stansbury v. California*, 511 U.S. 318 (1994), the defendant voluntarily went to the police

station for questioning, at a time when all parties believed the defendant to merely be a potential witness. *Id.* at 320. The case was ultimately remanded by the United States Supreme Court back to the California Supreme Court because the latter had previously focused too much attention on the "officers' subjective beliefs," rather than "the objective conditions surrounding his interrogation." *Id.* at 325-326. Again, Defendant was not voluntarily in the presence of the officers. Although Officer LeGault did not specifically tell Defendant that he was under arrest at the outset of the interaction, Officer LeGault testified that this was due to the fact that Defendant already knew he had outstanding warrants (Transcript, pp. 31-32). In other words, not only did the officers intend to arrest Defendant from the outset, but Defendant also knew he would be arrested on outstanding warrants from the outset. Then, Defendant was indeed handcuffed and taken to jail on those very same outstanding warrants. The objective facts show that Defendant was in custody for *Miranda* purposes *ab initio*. There was no outstanding arrest warrant in *Stansbury*.

*Howes v. Fields*, 565 U.S. 499 (2012), involved the questioning of an incarcerated defendant regarding a crime that occurred prior and unrelated to his incarceration. *Id.* at 502-503. Based upon "the undisputed fact that [the defendant] was told that he was free to end the questioning and to return to his cell," both at the beginning and during the course of the interrogation, the Supreme Court held that he was not in custody within the meaning of *Miranda*. *Id.* at 515-517. Although *Howes* is of limited value in this case, given that Defendant was not incarcerated at the time of his questioning, it is also distinguishable because there was not outstanding arrest warrant and, here, Defendant was never told he was free to leave.

In *Maryland v. Shatzer*, 559 U.S. 98 (2010), the Supreme Court expressly declined to adopt a bright-line rule for determining the applicability of *Miranda* in prisons. The Court noted that it "ha[s] never decided whether incarceration constitutes custody for *Miranda* purposes, and ha[s]

indeed explicitly declined to address the issue." *Id.* at 112 (*citing Illinois v. Perkins*, 496 U.S. 292, 299 (1990)). The government also cites *Perkins*, which has similar facts and a holding similar to those of *Shatzer*. *Shatzer* and *Perkins* are of no value in this case.

*United States v. Mendenhall*, 446 U.S. 544 (1980), involves absolutely no *Miranda* issue, and said case contains no citation whatsoever to *Miranda*. Likewise, *Florida v. Royer*, 460 U.S. 491 (1983), involves no *Miranda* issue, although *Miranda* is mentioned in footnote 9 to distinguish *Royer* from another case. *Mendenhall* and *Royer* are of no value in this case.

## CONCLUSION

The Report and Recommendation (Doc. 34) of the United States Magistrate as to the roadside and police headquarters statements of Defendant, without being given *Miranda* warnings, is well reasoned and grounded in applicable law. The government has cited no case on point, and has contradicted its own prior argument for the constitutionality of the vehicle stop. The Report and Recommendation (Doc. 34) should be adopted by the Court, and the government's objection (Doc. 41) thereto should be overruled.

Respectfully submitted,

s/J. Russell Pryor

_____

J. RUSSELL PRYOR,
Attorney for Defendant
206 S. Irish St.
Greeneville, TN 37743
(423) 639-0255

CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2020, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other interested parties will be served by regular U.S. Mail. Parties may access this filing through the Court's electronic filing system.

                                                                s/J. Russell Pryor
                                                               _____
                                                               J. RUSSELL PRYOR